IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger

Civil Action No. 13-cv-00450-MSK-MJW

KELLY D. DAVIS,

    Plaintiff,

v.

UNITED STATES OF AMERICA,

    Defendant.
_____

**OPINION AND ORDER GRANTING GOVERNMENT'S MOTION FOR SUMMARY JUDGMENT**
_____

**THIS MATTER** comes before the Court pursuant to Mr. Davis' Motion for Summary Judgment **(# 49)**, the Government's response **(# 50)**, and Mr. Davis' reply **(# 52)**; and the Government's Motion for Summary Judgment **(# 48)**, Mr. Davis' response **(# 51)**, the Government's reply **(# 53)**, and Mr. Davis' sur-reply **(# 54)**.

## FACTS

The pertinent facts of this case are undisputed. Between 2005 and 2009, Mr. Davis and Allyce Card were co-owners of WVC, a construction contractor. Mr. Davis was the President of WVC and managed the company's field operations. Ms. Card was WVC's bookkeeper and managed its finances and office staff. WVC withheld money from employee paychecks to satisfy federal payroll tax obligations, but it did not pay those funds over to the Government. Instead, it diverted those funds to pay operating expenses, creditors, and, apparently, personal obligations of Mr. Davis and Ms. Card.

1

The parties agree that Mr. Davis became aware of WVC's failure to remit withheld payroll taxes to the Government by early 2009, and further agree that, although WVC continued to operate throughout the remainder of 2009, Mr. Davis never caused WVC to rectify the tax delinquencies with the federal government. The Government assessed nearly $1 million in tax penalties against Mr. Davis, personally, pursuant to 26 U.S.C. § 6672 for non-payment of the employment taxes. Mr. Davis commenced this action to challenge those assessments. He seeks a declaration that he owes nothing to the Government; the Government has counterclaimed for a determination under § 6672 that Mr. Davis owes the penalties.

Both sides have moved **(# 48, 49)** for summary judgment in their favor.

## ANALYSIS

### A. Standard of review

Rule 56 of the Federal Rules of Civil Procedure facilitates the entry of a judgment only if no trial is necessary. *See White v. York Intern. Corp.*, 45 F.3d 357, 360 (10th Cir. 1995). Summary adjudication is authorized when there is no genuine dispute as to any material fact and a party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). Substantive law governs what facts are material and what issues must be determined. It also specifies the elements that must be proved for a given claim or defense, sets the standard of proof and identifies the party with the burden of proof. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Kaiser-Francis Oil Co. v. Producer's Gas Co.*, 870 F.2d 563, 565 (10th Cir. 1989). A factual dispute is "genuine" and summary judgment is precluded if the evidence presented in support of and opposition to the motion is so contradictory that, if presented at trial, a judgment could enter for either party. *See Anderson*, 477 U.S. at 248. When considering a summary judgment motion, a court views all evidence in the light most favorable to the non-moving party, thereby

favoring the right to a trial. *See Garrett v. Hewlett Packard Co.*, 305 F.3d 1210, 1213 (10th Cir. 2002).

If the movant has the burden of proof on a claim or defense, the movant must establish every element of its claim or defense by sufficient, competent evidence. *See* Fed. R. Civ. P. 56(c)(1)(A). Once the moving party has met its burden, to avoid summary judgment the responding party must present sufficient, competent, contradictory evidence to establish a genuine factual dispute. *See Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 891 (10th Cir. 1991); *Perry v. Woodward*, 199 F.3d 1126, 1131 (10th Cir. 1999). If there is a genuine dispute as to a material fact, a trial is required. If there is no genuine dispute as to any material fact, no trial is required. The court then applies the law to the undisputed facts and enters judgment.

If the moving party does not have the burden of proof at trial, it must point to an absence of sufficient evidence to establish the claim or defense that the non-movant is obligated to prove. If the respondent comes forward with sufficient competent evidence to establish a *prima facie* claim or defense, a trial is required. If the respondent fails to produce sufficient competent evidence to establish its claim or defense, then the movant is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

This case involves cross-motions for summary judgment. "Because the determination of whether there is a genuine dispute as to a material factual issue turns upon who has the burden of proof, the standard of proof and whether adequate evidence has been submitted to support a *prima facie* case or to establish a genuine dispute as to material fact, cross motions must be evaluated independently." *In re Ribozyme Pharmaceuticals, Inc., Securities Litig.*, 209 F. Supp. 2d 1106, 1112 (D. Colo. 2002); *see also Atlantic Richfield Co. v. Farm Credit Bank of Wichita,*

226 F.3d 1138, 1148 (10th Cir. 2000); *Buell Cabinet Co. v. Sudduth*, 608 F.2d 431, 433 (10th Cir. 1979) ("Cross-motions for summary judgment are to be treated separately; the denial of one does not require the grant of another."). However, because, as set forth herein, all material facts are undisputed, the Court need simply recite those facts and then apply the law to them.

**B. Merits**

The Government's claim is brought pursuant to 26 U.S.C. § 6672, which provides that "any person required to collect, truthfully account for, and pay over any [payroll] tax . . . who willfully fails to . . . pay over such tax [shall] . . . be liable to a penalty equal to the total amount of the tax [not paid over]." The claim has two elements: (i) that the defendant is a "responsible person" – that is, responsible within the business for ensuring the proper payment of the taxes, and (ii) that he or she willfully failed to pay over the tax money to the government.[1] The taxpayer bears the burden of proving by a preponderance of the evidence that he is either: (i) not a "responsible person," or (ii) that his failure to pay taxes was not willful. *U.S. v. Hodges*, 684 Fed.Appx. 722, 728 (10th Cir. 2017); *Byrne v. U.S.*, 857 F.3d 319, 327 (6th Cir. 2017).

1. Responsibility

Mr. Davis' first argument is that it was Ms. Card – and only Ms. Card – that was responsible for WVC's (non-)payment of payroll taxes, and therefore he is not a "responsible" person under Section 6672. A person is "responsible" for payment of taxes if that person is required to collect, account for, or pay over taxes withheld from employees' wages. *Bradshaw v. U.S.*, 83 F.3d 1175, 1178 (10th Cir. 1995). A responsible person will generally be a managing officer or employee, and there may be more than one responsible person in an entity. *Denbo v.*

---

[1] The 10th Circuit also recognizes a third element, essentially a defense that "reasonable cause" existed for the defendant's failure to remit the taxes. *See Finley v. U.S.*, 123 F.3d 1342, 1344 (10th Cir. 1997). Mr. Davis has not suggested that the "reasonable cause" excuse would apply here, and thus, the Court does not consider it.

4

*U.S.*, 988 F.2d 1029, 1032 (10th Cir. 1993). The question is not who had the most control over company finances, but simply whether the person in question had significant control over the payment of taxes – more specifically, whether the person had "the actual authority or ability, in view of his status within the corporation, to pay the taxes owed." *Smith v. U.S.*, 555 F.3d 1158, 1165 (10th Cir. 2009). Responsibility turns on whether the person in question had "sufficient, though not necessarily exclusive, authority in the general management and financial decisionmaking of the corporation." *Denbo*, 988 F.2d at 1032. The question of responsibility is fact-intensive, and indicia of such responsibility might include the person holding corporate office, controlling financial affairs, having the ability to disburse corporate funds, owning stock in the entity, and having the ability to hire and fire employees. *Denbo v. U.S.*, 988 F.2d 1029, 1032 (10th Cir. 1993).

The undisputed facts show that Mr. Davis was a co-owner of WVC from its inception in 2005,[2] was a director of the company, and served as the company's President throughout its existence. Ms. Card had various titles, including "owner, CFO, CEO, secretary, [and] treasurer," and it is undisputed that she had the primary responsibilities of managing WVC's finances and keeping its books. Mr. Davis managed the company's field operations, was responsible for the hiring and firing of WVC's field staff (Ms. Card hired office staff), and he set the hourly rates of pay for its employees. He testified that he brought in Ms. Card in 2005 because "[a]s the company was getting bigger . . . we used QuickBooks, and [Ms. Card] was helping with the QuickBooks and setting it up. And it stated to get overwhelming for me to have those functions, and I really needed someone that I thought I could trust to come in and do the bookkeeping and things that I couldn't do." Ms. Card's own testimony was that, when she came to WVC, "I took

---

[2] After business disputes arose in 2008, Mr. Davis bought out Ms. Card's share of the company's stock, thereby becoming sole owner. WVC was already in tax arrears by this time.

5

over the banking, I took over the loan negotiations, I took over the responsibility for the vendor guarantees." Ms. Card testified that Mr. Davis did not have "any input or say with regards to the accounting or finances of WVC" and that she exercised "total" control over the company's finances.

Ms. Card's statements notwithstanding, however, the record also reflects that Mr. Davis had signing authority on the company checking account and would sign payroll and vendor checks (that had been prepared by Ms. Card) when she was not available. He also had the ability to go to Ms. Card and request that she produce a check (say, for payment to a vendor) that either he or she would sign. According to Ms. Card, Mr. Davis would give input on whether one creditor should be prioritized over another creditor, although she testified that this occurred "rarely." On one occasion, Mr. Davis requested that Ms. Card issue a company check for $113,000 so that he could purchase a sports car for his personal use, and Ms. Card did so.

The Court finds that, on these facts, Mr. Davis was a "responsible person" at WVC throughout the company's life span. Examining the factors recited in *Denbo*, it is clear that Mr. Davis was a corporate officer of WVC, that he held stock in the company, and that he had the ability to hire and fire employees. Although it is clear that Ms. Card exercised considerable, if not dominant, control over WVC's finances, it is apparent that she did so effectively by Mr. Davis' <u>delegation</u> of that authority, not because Mr. Davis lacked the <u>power</u> to control the company's finances. "Responsible person" status turns on whether a given individual has the <u>authority</u> to direct that taxes be paid, not whether the individual's job called upon him to <u>exercise</u> that power. *See e.g. Denbo*, 988 F.2d at 1032 ("while he did not exercise his authority to sign checks, he had such authority from the beginning"); *Taylor v. I.R.S.*, 69 F.3d 411, 416 (10th Cir. 1995) ("If an individual possesses sufficient indicia of responsibility, he is a 'responsible person'

6

under § 6672 regardless whether he [ ] has the final say as to which creditors should be paid or [ ] has the specific job within the corporate structure to see that the taxes are paid over to the government"). As noted above, when Ms. Card was unavailable to sign checks, the checks did not go unsigned due to the absence of any other empowered official; Mr. Davis simply signed them. Mr. Davis could request that Ms. Card issue checks for him to sign and Ms. Card would do so, and Mr. Davis testified that he could not recall an occasion where he requested a check and Mr. Card refused. Most significantly, he requested that she produce a check so that he could spend company funds on a luxury sports car for his personal use; such a request could only be successfully made by a person with at least the <u>ability</u> to dictate the control of company finances.

Mr. Davis cites to various cases in which individuals in ostensibly similar circumstances were found not to possess "responsible person" status. *Citing Stewart v. U.S.*, 19 Cl. Ct. 1 (Fed. Cl. 1989); *Winchester v. I.R.S.*, 686 F.Supp. 605, 607 (E.D.Mi. 1987); and *Williams v. U.S.*, 25 Cl Ct. 682, 684 (Fed. Cl. 1992), *among others*. As with all fact-intensive inquiries, comparisons to other cases rarely captures and isolates all of the pertinent facts or notes distinguishable ones, making such citations of little value. Moreover, all the cases upon which Mr. Davis relies were decided by courts outside the 10th Circuit. Cases within the Circuit take a "broad interpretation" of the responsible person standard. *Denbo*, 988 F.2d at 1032. Thus, the Court finds that the cases from the 10th Circuit finding "responsible person" status on even more limited facts are persuasive here. *See Denbo*, *id.* (co-owner of business who contributed capital and had – but never used – check-signing authority was "responsible person," even though he did not control day-to-day financial operations or make decisions concerning payment of creditors or disbursement of funds); *Taylor*, 69 F.3d at 416-17 (non-owner director of company who managed field operations and had check-signing authority was "responsible person" even though

7

he engaged in fiscal matters "only at the direction of" co-owner who managed finances); *U.S. v. Crabbe*, 364 Fed.Appx. 412, 419 (10th Cir. 2010) (co-owner and officer who participated in hiring and firing and had check-signing ability was "responsible person" even though partner "often marginalized [defendant's] authority" over day-to-day matters, including financial and payroll matters).

Accordingly, the Court finds that Mr. Davis was a "responsible" person for purposes of WVC's failure to remit delinquent employment taxes during that period.[3]

### 2. Willfulness

A taxpayer acts willfully where he "had knowledge of the tax delinquency and knowingly failed to rectify it when there were available funds to pay the government." *Byrne*, 857 F.3d at 327, *quoting Gephart v. U.S.*, 818 F.2d 469, 475 (6th Cir. 1987). Funds are deemed "encumbered" – and thus, unavailable to rectify tax deficiencies -- only when the taxpayer is legally obligated to use them for some purpose other than the satisfaction of tax delinquencies and that obligation is superior to the IRS' interest in the funds. *Schiffman v. U.S.*, 811 F.3d 519, 527 (1st Cir. 2016).

Here, Mr. Davis has offered two justifications for his failure to remit the delinquent taxes when he was the sole owner of the company in 2009: (i) the existence of the Colorado Trust Fund Statute, C.R.S. § 38-22-127(1), and (ii) WVC having ceded control over all its assets to its lender, Mutual of Omaha Bank ("MOB").

---

[3] As discussed below, Mr. Davis makes an argument that any funds that WVC had during 2009 were encumbered by its lender, such that the lender effectively controlled all decisions as to how such funds were spent. This same argument could be conceptualized as one in which Mr. Davis contends that he had no control over financial decisions and thus was not a "responsible" person. *See e.g. Bradshaw*, 83 F.3d at 1179-80. Ultimately, for the reasons set forth herein, the argument fails in any event.

The Colorado Trust Fund Statute provides that "All funds disbursed to any contractor or subcontractor under any building, construction, or remodeling contract or on any construction project shall be held in trust for the payment of the subcontractors, laborer or material suppliers, or laborers who have furnished laborers, materials, services, or labor." Thus, the statute treats all funds "disbursed" to a contractor as progress payments on a given construction job to be held by that contractor in a constructive trust to guarantee that any subcontractors, laborers, or material suppliers that have furnished labor or services to the contractor will be paid in full. Courts have held that state lien statutes of this type constitute legal obligations that sufficiently encumber corporate funds such that the failure to use such funds to pay tax delinquencies does not amount to "willful" conduct. *Huizinga v. U.S.*, 68 F.3d 139, 145 (6th Cir. 1995). For these reasons, the Court will assume –without necessarily finding – that funds received by WVC from its customers as progress payments on existing jobs were encumbered by operation of the Trust Fund Statute, and Mr. Davis did not willfully fail to pay over those funds to the Government to satisfy WVC's tax obligations.

Mr. Davis' second argument requires more scrutiny. Prior to 2009, WVC had entered into an agreement with MOB by which MOB would extend a line of credit to WVC in exchange for a security interest in effectively all of AVC's assets, including accounts receivable. WVC also executed a commercial security agreement with MOB, by which WVC agreed that it would not "assign, convey, lease, sell or transfer any of the Collateral" – its physical assets, accounts receivable, or even cash-on-hand – "without the prior written consent of [MOB]." Mr. Davis argues that, as a consequence, MOB "had absolute control over the use and disposition of all of WVC's assets," effectively preventing Mr. Davis from making any payments other than those approved by MOB.

The Court begins by noting a split of authority over the question of whether contractually-imposed, voluntarily-assumed restrictions on a company's ability to direct funds constitutes an "encumbrance" that would preclude a finding of "willful" non-payment of payroll taxes. The majority rule recognizes that a company's voluntary decision to grant a security interest or other control over company funds to a lender does not create an encumbrance on those funds that thereafter excuses a failure to rectify tax delinquencies; it is only legally-imposed encumbrances (*e.g.* those created by statute or regulation) that excuse payment of tax obligations. *See Honey v. U.S.*, 963 F.2d 1083, 1090 (8th Cir. 1992); *U.S. v. Kim*, 111 F.3d 1351, 1359 (7th Cir. 1997); *Bell v. U.S.*, 355 F.3d 387, 395 (6th Cir. 2004); *Nakano v. U.S.*, 742 F.3d 1208, 1212 (9th Cir. 2014). By contrast, an oft-cited but seldom-adopted minority rule is articulated in *In re Premo*, 116 B.R. 515, 535 (Bankr.E.D.Mi. 1990). There, the court held that "where the taxpayer's discretion in the use of funds is subject to restrictions imposed by a creditor holding a security interest in the funds which is superior to any interest claimed by the IRS, the funds are regarded as encumbered if those restrictions preclude the taxpayer from using the funds to pay the trust fund taxes."

Although it has not done so with specific reference to any of the cases cited above, the 10th Circuit has, in effect, adopted the majority rule. In *Bradshaw*, as here, the plaintiff had entered into a financing agreement that gave his lender control over all disbursements of company funds. Thus, he argued that he "lacked the power to disburse funds from [the company's] accounts absent the bank's approval." In response, the government argued that "this voluntary cession of financial authority cannot absolve Bradshaw of his responsibility under § 6672." *Id.* at 1180. Agreeing with the government, the 10th Circuit announced its approval of an older iteration of the majority rule referenced above: "*Kalb* [*v. U.S.*, 505 F.2d 506, 510 (2d Cir.

1974)] rests on the premise that a corporate officer may not escape liability as a 'responsible person' under § 6672 by voluntarily entering into agreements which permit preferring other creditors to the government. We are persuaded that this reasoning in *Kalb* should apply here." The 10th Circuit went on to observe that "[i]t may seem harsh to require a corporate officer in Bradshaw's position to resign or shut down his business in order to avoid liability under § 6672" when the bank refused his request to use corporate funds to pay back taxes, but "we believe that although the statute is harsh, the danger against which it is directed is an acute one against which, perhaps, only harsh measures are availing." *Id.*

The 10th Circuit's adoption of the majority rule disposes of Mr. Davis' primary argument relating to MOB. Even if Mr. Davis is correct and MOB effectively controlled WVC's spending as of 2009, the fact remains that such control was ceded, voluntarily and by contract, from WVC to MOB. Thus, any funds that WVC received from MOB – and the record reflects that WVC routinely drew on a line of credit from MOB throughout 2009 – were not "encumbered." The record reflects that, in addition to receiving periodic progress payments from its customers (which would be encumbered by the Trust Fund Statute), WVC also received funds from its line of credit with MOB. Mr. Davis testified that MOB "was advancing a line of credit for us to operate so that they could get their receivables," and that WVC used the money advanced by MOB to make "materials, lease payments, rent payments, payroll." Thus, those funds were not encumbered for purposes of Section 6672, and Mr. Davis was required to apply those funds to WVC's tax delinquencies before using them to pay for operating expenses such as leases, rents, and payroll. It is undisputed that he failed to do so, and thus, his actions in 2009 amounted to a "willful" failure to remit delinquent payroll taxes for purposes of Section 6672.

Even assuming that the Court were to adopt the broader definition of "encumbered" from *Premo*, the result would remain the same, albeit for slightly different reasons. The rule of *Premo* is that "[w]here the taxpayer's discretion in the use of funds is subject to restrictions imposed by a creditor holding a security interest in the funds . . . the funds are regarded as encumbered if those restrictions <u>preclude</u> the taxpayer from using the funds to pay the trust fund taxes." 116 B.R. at 535 (emphasis added). At a minimum, proper application of the *Premo* rule would require an inquiry into whether the responsible person <u>sought</u> permission from the lender to use the encumbered funds to satisfy the delinquent taxes and was rejected, as opposed to silently assuming that the lender would not permit the payment of taxes. To hold otherwise – to allow the responsible person to simply assume that leave to pay the taxes would not be given by the lender, and thus, to never even ask – simply compounds the responsible person's ongoing disregard of tax obligations. Here, the record is undisputed that Mr. Davis never asked MOB for permission to use some of WVC's line of credit to pay the delinquent taxes that both he and MOB knew existed. Theodore Warren, MOB's representative, testified that MOB became aware of WVC's tax liabilities at some point in late 2009. Mr. Warren testified that MOB was unconcerned about the tax problems, as it viewed WVC as being involved in "a wind-down" of operations, "liquidating our collateral to apply towards our loan." However, Mr. Warren was expressly asked whether anyone at MOB had told Mr. Davis <u>not</u> to use the line of credit to pay the back taxes, and Mr. Warren answered "No, I would not direct people on what they pay and what they don't pay." He repeatedly denied ever telling Mr. Davis not to pay the delinquent taxes and insisted that the decision to not pay the taxes was not made by him or anyone at MOB. Similarly, Mr. Davis testified that he did not know whether he had ever asked MOB for permission to pay the back taxes. Thus, the record reflects that, to the extent Mr. Davis is correct

that MOB completely controlled WVC's spending decisions, MOB never prevented Mr. Davis from using some of WVC's unencumbered funds to satisfy the unpaid payroll taxes. Even under the *Premo* rule, that fact that Mr. Davis was not <u>precluded</u> by MOB from paying the taxes suffices to demonstrate that his non-payment of the taxes was "willful" for purposes of Section 6672.

Having found that Mr. Davis was both a "responsible person" and that he acted willfully in failing to use WVC funds in 2009 to pay WVC's unpaid payroll taxes, the Court grants judgment in favor of the Government. The parties do not dispute that, in 2009, Mr. Davis directed at least $1.3 million in corporate funds to Aspen Glen Leasing ("AGL") as lease payments on rented equipment. Mr. Davis has not argued that the AGL payments fall within the Trust Fund Statute, and this Court's reading of that statute does not indicate that AGL was a "subcontractor[ ], laborer or material supplier[ ]." Thus, the $1.3 million were unencumbered funds that Mr. Davis voluntarily directed to a creditor other than the Government. This is sufficient to warrant imposition of the $983,745.07 in tax penalties assessed by the Government, as it is clear that Mr. Davis had the ability to pay the unpaid taxes from WVC funds during 2009. As *Honey* notes, "it is no excuse that, as a matter of sound business judgment, the money was paid to suppliers and for wages in order to keep the corporation operating as a going concern – the government cannot be made an unwilling partner in a floundering business." 963 F.2d at 1093, *quoting Collins v. U.S.*, 848 F.2d 740, 741-42 (6th Cir. 1988).

## **CONCLUSION**

For the foregoing reasons, the Court **GRANTS** the Government's Motion for Summary Judgment **(# 48)** and **DENIES** Mr. Davis' Motion for Summary Judgment **(# 49)**. The Clerk of the Court shall enter judgment in favor of the Government and against Mr. Davis on both Mr.

Davis' claim and the Government's counterclaim, awarding the Government the sum of $983,745.07.

Dated this 6th day of March, 2018.

**BY THE COURT:**

_Marcia S. Krieger_

Marcia S. Krieger
Chief United States District Judge